IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NAQIS CROCHRAN,
*Through his next friend*
*Amatullah Shields, et al.*,

        Plaintiffs,

v.

COLUMBUS CITY SCHOOLS,
*et al.*,

        Defendants.

Civil Action 2:15-cv-632
Chief Judge Edmund A. Sargus, Jr.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (ECF No. 77), Plaintiffs' Memorandum in Opposition (ECF No. 79), Defendants' Reply in Support (ECF No. 91), as well as Defendants' Motion in Limine to exclude testimony of Sarah Silverman (ECF No. 90), Plaintiffs' Motion in Limine to exclude testimony of Noelle Witherspoon Arnold, Ph.D. (ECF No. 92), Defendants' Motion to Strike (ECF No. 94), and Plaintiffs' Motion to Strike. (ECF No. 93.) For the reasons that follow, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** as moot (ECF No. 77), Defendants' Motion in Limine is **DENIED** as moot (ECF No. 90), Plaintiffs' Motion in Limine is **DENIED** as moot (ECF No. 92), Defendants' Motion to Strike is **DENIED** at moot, and Plaintiff's Motion to Strike is **DENIED** at moot. (ECF No. 93.)

# I. BACKGROUND

Plaintiff, Naqis Crochran ("N.C." or "Plaintiff") brings this suit through his mother and next friend, Amatullah Shields (together, "Plaintiffs"), against special education teacher Courtney Plummer ("Ms. Plummer") and her employers, the Columbus Board of Education ("CBE") and Columbus City Schools ("CCS"). N.C. alleges violations under 42 U.S.C. § 1983 for violations of his Fourth and Fourteenth Amendment rights, and under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 1201 *et seq.* ("ADA"), as well as state claims for tortious conduct. Defendants move for summary judgment on all claims.

# II. FACTS

N.C. attended Fifth grade at South Mifflin STEM academy ("SMSA"). (Pls.' Opposition to Defendant's Motion for Summary Judgment ("Pls.' Opp.") at 9, ECF No. 79.) He has been diagnosed with autism and ADHD, and at the time of the incident, was a student in Ms. Plummer's special education class. Ms. Plummer taught special education grades four through six at SMSA. (*Id.* at 11.) She has an undergraduate degree in early education and a master's degree in intervention, which she received as an intervention specialist for kindergarten through twelfth grade. (Plummer Dep.6:20–23, ECF No. 77-4.) N.C. had been Ms. Plummer's student for over a year at the time of the incident.

Ms. Plummer testified at her deposition that on February 20, 2013, N.C. was acting in a disruptive manner, which she described as uncharacteristic of him. (Plummer Dep. 20:1–18.) She explained her typical classroom management system, "a stoplight system" which has built-in rewards and consequences, normally worked with N.C. (Plummer Dep. 2016–18; 22:2–5.) On

this occasion, however, she reported that N.C. did not respond well to the stop-light system and he continued to act out, laughing, interacting negatively with other students, and jumping up and spinning around. (Plummer Dep. 19:22–24; 20:1–3; 22:6–7.) When her normal system did not work to help regulate N.C.'s behavior, Ms. Plummer's co-worker, a fellow special education teacher Laura Shearer suggested she use a body sox to help calm N.C. (Plummer Dep. 22:8–14.)

Ms. Shearer has an autistic son who responds well to use of the body sox. She explained, "[m]y son, much like [N.C.], is very sensory seeking. Anybody who's familiar with autism knows that [the body sox is] a sensory tool used to put pressure on a child. . . . It is a four-way, breathable lycra band that the child steps into and stretches." (Shearer Dep. 6:16–21.) As illustrated in the images below, the body sox can be used in a manner that covers the user's face or leaves the face exposed. If the child's face is covered, he or she can still "discern outside shapes." (Exhibit 10, 77-1.) The opening is velcro, which allows for easy entries and exits. (*Id.*) The body sox further forms around the child's arms in loose sleeves, allowing the child full use of his or her arms. The user's arms are therefore in no way restrained by the body sox, and the child is able to use his or her arms to open or close the velcro opening. (*Id.*; Shearer Dep. 17:13–17 ("I would not call it a restraint, because a child can move about freely and can breathe freely.").)



(Exhibit 10, 77-1.) Ms. Shearer first learned about body sox from her son's pediatrician. She described the sensory effect on children wearing the body sox, stating "it causes them to have like a massage feeling much like a weighted vest, but all over their body." (Shearer Dep. 7:2–4.) Prior to the incident Ms. Plummer had seen the body sox used on a regular basis. Her first job as a special education teacher was at a school for children with autism. She testified, "there was a child who wore a body sock almost every single day, he walked classroom to classroom in it . . . it helped him to be calm and regulate himself." (Plummer Dep. 27:5–12.) Ms. Shearer similarly testified that the school her son attends uses the body sox as a sensory tool for autistic students. (Shearer Dep. 16:17–22.)

The special education classroom had one body sox, property of the school, Ms. Shearer said was in her closet with other sensory tools. (Shearer Dep. 5:7–23.) Earlier on the same day as the incident, the body sox had been used with a different student, which N.C. witnessed. (Plummer Dep. 26:15–19; N.C. Dep. 22:20–24.) After suggesting that Ms. Plummer use the body sox with N.C., Ms. Shearer explained how to use it. (Shearer Dep. 18:15–19.) Ms. Shearer then left the room to attend to another student. (*Id.*)

Ms. Plummer testified that she asked N.C. if he wanted to wear the body sox and that he replied "yes." (Plummer Dep. 22:12–13.) She then held it open for him while he stepped into it. (Plummer Dep. 2213–14; N.C. Dep. 23:9–11 (Q. "Okay. Did you step into the purple sock yourself?" A. "Yes. And she said, "Hold still. Don't be stretchy."; 23:15–17 (Q. "Did anybody help you get in the purple sock, or did you get in it yourself?" A. "I get in it myself.")).) While wearing the body sox, N.C. began moving his feet. (Pl.'s Opp. at 14.) Ms. Plummer told N.C. to stand still, however, within seconds N.C. fell. (Plummer Dep. 22:14–16; N.C. Dep. 24:18–20.)

4

When he fell, N.C. hit the floor with his face. (Pls.' Opp. at 14.) He was then brought to the school nurse, Mary Ramming for first aid. (*Id.*)

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## IV. DISCUSSION

Plaintiffs bring claims under 42 U.S.C. § 1983, IDEA, and the ADA, as well as state law claims for tortious conduct. The Court will review each claim in turn.

### A. Section 1983 Claims

Plaintiffs first bring claims against Ms. Plummer, the Columbus City Schools, and the Columbus Board of Education under 42 U.S.C. § 1983, alleging Defendants violated various constitutional rights. Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. A prima facie case under Section 1983 requires (1) conduct by an individual acting under color of state law, and (2) this conduct must deprive the plaintiff of rights secured by the Constitution or laws of the United States. *Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). As discussed below, Plaintiffs fail to point to evidence that establishes a constitutional violation. Accordingly, the Court **GRANTS** summary judgment for Defendant Plummer on Plaintiffs' § 1983 claims. Plaintiffs further assert vicarious liability claims for violation of § 1983 against Columbus City Schools and the Columbus Board of Education for Ms. Plummer's use of the body sox. As Plaintiffs have failed to establish constitutional violations against Ms. Plummer, judgment is similarly **GRANTED** on their claims against Columbus City Schools and the Columbus Board of Education.

1. **Fourteenth Amendment Right to Equal Protection**

Plaintiffs contend that Ms. Plummer violated N.C.'s right to equal protection by her utilization of the body sox because she "never used a body sock on another student before." (Pls.' Opp. at 28.) The Equal Protection Clause of the Fourteenth Amendment protects against discrimination by the government that "burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Gohl v. Livonia Pub. Sch.*, 134 F. Supp.3d 1066, 1087 (E.D. Mich. 2015) (citing *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012) (quoting *Rondingo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681–82 (6th Cir. 2011))).

Persons with a disability "are not a suspect class for purposes of an equal protection challenge. *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 457 (6th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 522 (2004)). "A state may therefore treat disabled students differently, so long as its actions are rationally related to some legitimate governmental purpose." *Id.* (citing *Bd. Of Trustees of Univ. Ala. v. Garrett*, 531 U.S. 356, 366–68 (2001)). In a motion for summary judgment, the plaintiff possesses the burden of demonstrating that defendants treated similarly situated individuals in a disparate manner. *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1360 (6th Cir. 1996).

Defendants contend that Plaintiffs have failed to set forth any factual allegations that N.C. was treated differently from other similarly situated students without any rational basis. (Defendants' Reply in Support ("Defs.' Reply") at 11, ECF No. 91.) The Court agrees. The evidence shows that body sox were used as a therapeutic tool to help calm students with autism. (Shearer Dep. 6:16–21.) Indeed, the day of the incident, the body sox was used with another student in N.C.'s class. (Brooks Aff. Attached as Exhibit B, ECF No. 77-2.) Defendants have

shown that use of the body sox served a legitimate educational purpose to calm N.C. in an effort to stop his interference with the class. *See Martin v. Temple*, 1998 U.S. App. LEXIS 1680, at *3 (6th Cir. Feb. 2, 1998) (finding expulsion of disabled plaintiff was "'rationally related' to [the school's] legitimate purpose of maintaining a safe environment on STIM's campus, conductive to its objectives of teaching and learning."). Plaintiffs have put forward no evidence in contradiction. *Gohl*, 836 F.3d 672 (affirming summary judgment on equal protection claim where plaintiff did not provide evidence about how similarly situated non-disabled students were treated). Accordingly, summary judgment is **GRANTED** for Defendants on Plaintiffs' equal protection claim.

### 2. Substantive Due Process

Plaintiffs allege Ms. Plummer violated N.C.'s substantive due process rights under the Fourteenth Amendment through her use of the body sox. (Pls.' Opp. at 26.) In order to raise a material issue of fact as to whether a teacher violates a student's substantive due process rights under the Fourteenth Amendment, "a plaintiff 'must identify conduct that is so brutal, demeaning, and harmful as literally to shock to conscience.'" *Gohl*, 836 F.3d at 694 (citing *Domingo v. Kowalski*, 810 F.3d 403, 406, 410–11 (6th Cir. 2016) (finding teacher's conduct did not "shock the conscious" where teacher was accused of abuse after gagging a student with a bandana, strapping another to a toilet, and forcing another to sit with her pants down on a training toilet in front of all of her classmates.)

To determine whether conduct shocks the conscience in violation of due process, the Court must consider whether "(1) there was a 'pedagogical justification for use of force,' (2) the force utilized was excessive to meet a 'legitimate objective,' (3) the force was applied in a 'good-faith effort to maintain or restore discipline or maliciously and sadistically for the very

8

purpose of causing harm,' and (4) there was a 'serious injury.'" *Id.* (citing *Domingo*, 810 F.3d at 410–411; *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 173 (3rd Cir. 2001).

Plaintiffs contend that Ms. Plummer's conduct in having N.C. wear a body sox "shocks the conscious," conclusively asserting that she had no pedagogical purpose because she is not trained in occupational therapy, that her actions were excessive because the body sox covered N.C.'s face, and that Ms. Plummer did not act in good faith because she "knowingly risked that [N.C.] might fall down and suffer injury due to his balance and body control problems." (Pls.' Opp. at 27.)

Drawing all justifiable inferences from Plaintiffs' assertions, at best, the evidence speaks to a potential claim for negligence. As evidenced, Ms. Plummer's use of the body sox was recommended to her by another teacher who first learned about the device from her pediatrician to help calm her autistic son. (Shearer Dep. 6:16–21.) Further, Ms. Plummer has observed the use of body sox on other autistic children without incident. There is no factual dispute with regards to how N.C. put the body sox on. Plaintiff does not provide evidence to contest the fact that Ms. Plummer held the garment open and N.C. stepped into it on his own. (Plummer Dep. 2213–14; N.C. Dep. 23:9–11.) Plaintiffs do not even assert that Ms. Plummer used any force to put N.C. into the body sox. Finally, for the very short amount of time that N.C. had the body sox on before falling, he describes himself as "laughing and giggling." (N.C. Dep. 24:16–19.) When N.C. was asked if he was having fun in the body sox until he fell, he responded "Yes, I did. I accidentally fell." (N.C. Dep. 24:23–24; 25:1.) The alleged conduct nowhere near amounts to conduct applied "maliciously and sadistically for the very purpose of causing harm." *Gohl*, 836 F.3d at 694. Accordingly, no reasonable jury could find that N.C.'s substantive due process rights under the Fourteenth Amendment were violated.

### 3. Fourth Amendment

Plaintiffs allege that Ms. Plummer violated N.C.'s Fourth Amendment right against unreasonable and unlawful seizure through use of the body sox. (Pls.' Opp. at 25.) Plaintiffs claim that the body sox acted as a restraint and 'seizure' of N.C. (*Id.*) The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. While the Fourth Amendment applies within the school setting, "the setting and the purpose of actions undertaken outside the typical law enforcement context profoundly affect their reasonableness." *Couture v. Bd. Of Educ. Of the Albuquerque Pub. Schs.*, 535 F.3d 1243, 1250 (10th Cir. 2008) (citing *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1998) ("the rights of students must be applied in light of the special characteristics of the school environment" (internal citations omitted)); *see also, New Jersey v. T.L.O.*, 469 U.S. 325, 336–37 (1985). Within the school setting in particular, the Fourth Amendment is regarded in a different manner.

> We must think about seizures differently in the school context, as students are generally not at liberty to leave the school building when they wish. *See* [*Vernonia School Dist. 47*] *v. Acton*, 515 U.S. 646, 654 (1995)] ("[U]nemancipated minors lack some of the most fundamental rights of self[-]determination—including even the right to come and go at will."); *Wallace v. Batavia School Dist.*, 101 68 F.3d 1010, 1013 (7th Cir. 1995) ("[L]aw compels students to attend school, which deprives them of a level of freedom of mobility. Once under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators."). To qualify as a seizure in the school context, the limitation on the student's freedom of movement must significantly exceed that inherent in every-day, compulsory attendance.

*H.M. v. Bd. of Educ.*, Case No. 1:14-cv-64, 2015 U.S. Dist. LEXIS 101103, at *23–24 (S.D. Ohio Aug. 3, 2015) (quoting *Couture*, 535 F.3d at 1250–51)). If the Court determines that a seizure has taken place, the next questions are "whether that seizure was justified at its inception and whether the seizure was permissible in scope." *H.M.*, 2015 U.S. Dist. LEXIS 101103, at *24

(citing *Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989). A seizure is "permissible in its scope when the measures adopted are reasonably related to the objectives of the [seizure] and not excessive[] . . . in light of the age and sex of the student and the nature of the infraction." *Id.* at *24–25 (citing *T.L.O.*, 469 U.S. at 342)).

As an initial matter, the Court finds that N.C.'s wearing of the body sox does not constitute a "seizure" under the Fourth Amendment. The undisputed evidence shows that the body sox did not restrict N.C.'s arms from movement. Furthermore, Plaintiffs do not even allege that Ms. Plummer forced or even told N.C. to remain with his head covered. Although initially N.C. wore the body sox covering his head, the suit is built so that N.C. had the ability to control whether his head remained covered or not because the hole keeping N.C.'s head covered was secured with velcro and built for special needs children to be able to open. (Exhibit 10, ECF No. 77-1; Exhibit 1, ECF No. 1-1)

Alternatively, under the assumption that wearing the body sox constituted a seizure, the record establishes that use of the body sox was both justified at its inception and permissible in scope. It is undisputed that N.C. was acting out in class on February 20, 2013, "talking out of class and being disruptive. He proceeded to stand up out of his seat and jump and spin around and also was interacting negatively with other students . . ." (Plummer Dep. 19:19–24, 20:1–3; (Pls.' Opp. at 11–12.).) Upon recommendation by a co-worker, Ms. Plummer utilized the body sox with N.C. for the short period of time before he fell. As an educator, Ms. Plummer is responsible for trying to control her student's behavior, such as N.C.'s when he was disruptive, and teach the other students in the special education classroom. In an attempt to calm N.C., Ms. Plummer utilized a sensory tool specifically for autistic children such as N.C. Accordingly, Ms. Plummer's use of the body sox was reasonable. *Couture*, 535 F.3d 1251–52 (finding special

education teacher's use of a "timeout room" reasonable given the students' disruptive behavior). Thus, no reasonable jury could find that N.C.'s Fourth Amendment rights were violated.

## B. Individuals with Disabilities in Education Act

Plaintiffs claim that Ms. Plummer's use of the body sox violates the Individuals with Disabilities in Education Act ("IDEA") and resulted in a failure to provide N.C. with an appropriate education, including a safe and secure educational environment. (Pls.' Opp. at 32.) Plaintiff only seeks monetary damages for the physical injury that resulted from N.C.'s fall.

The IDEA, 20 U.S.C. § 1412(a)(1), guarantees children with disabilities access to free and appropriate public education. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89 (1982). Defendants argue that Plaintiffs' failure to exhaustive their administrative remedies preclude them from bringing a claim under the IDEA. In response, Plaintiffs contend that because they seek monetary damages not provided under the IDEA, they are not required to exhaust their administrative remedies, as that would be futile.

The IDEA provides that plaintiffs must exhaust their administrative remedies before bringing suit in federal court to obtain relief that is also available under the IDEA. *Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000) (citing *Doe v. Smith*, 879 F.2d 1340, 1343–44 (6th Cir. 1989)). However, the Sixth Circuit has allowed plaintiffs to bring suit for Section 1983 claims when challenging acts that occurred in a similar setting even though the plaintiffs failed to exhaust their administrative remedies under the IDEA. *Id.* at 915 (holding plaintiff's claim for monetary damages "does not arise under the IDEA and therefore that exhaustion [to bring § 1983 claims] is not required in her case.").

In *F.H. v. Memphis City Sch.*, 764 F.3d 638, 643–44 (6th Cir. 2014), the Sixth Circuit Court of Appeals held that because the plaintiff's alleged injuries were non-educational in nature,

and therefore did not fall under the IDEA, the district court erred by dismissing plaintiff's Section 1983 claims for plaintiff's failure to exhaust her administrative remedies under the IDEA. Contrary to Plaintiffs' assertions, the Court has not allowed any plaintiff to pursue claims under the IDEA without exhaustion. In fact, the Court has held just the opposite, that because plaintiffs had no claims under the IDEA, exhaustion of administrative remedies under the IDEA to bring claims for constitutional violations was unnecessary. *Id.* at 645 ("As such, we find that Appellants' § 1983 claims do not arise under the IDEA . . .").

Here, Plaintiffs have essentially argued that because they have no claim under the IDEA they do not have to exhaust administrative remedies. (Pls.' Opp. at 32 ("Exhaustion is not required for plaintiffs seeking money damages because damages are unavailable through the administrative process . . .[a]lso, there is no administrative remedy under the IDEA that is suited to remedying past physical injury.").) The Court agrees that Plaintiffs are not precluded from bringing their claims for constitutional violations under Section 1983 for failure to exhaust their administrative remedies under the IDEA because Plaintiffs' claims do not arise under the IDEA. Likewise, because Plaintiffs' claims do not arise under the IDEA judgment is **GRANTED** to Defendants on Plaintiffs' claims for violation of the IDEA.

### C. Claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 795(a).

"Apart from [§ 504's] limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *S.S.*, 532 F.3d at 453 (quoting *Weizel v. Bd. Of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2nd Cir. 2002). As in *S.S.*, neither difference between the ADA and § 504 are at issue in this case. (*Id.*) Both claims will therefore be analyzed together. *See Thompson v. Williamson Cnty.*, 219 F.3d 555, 557 n.3 (6th Cir. 2000) (noting that the plaintiff's ADA and § 504 claims may be analyzed together because the statutes provide the same remedies, procedures, and rights); *see also Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 n.2 (6th Cir. 1995) (concluding that the protections under the ADA parallel the protections available under the Rehabilitation Act, thus the court's reasoning with respect to the Rehabilitation Act "applied with equal force to the ADA claim.").

To establish a claim for discrimination under § 504 or the ADA, a plaintiff must prove "that he or she is (1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, and (3) being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program by reason of his or her disability." *Alexander v. Lawrence Cnty. Bd. Of Developmental Disabilities*, 2012 LEXIS 32197 at, *27–28 (S.D. Ohio March 12, 2012) (citing *S.S.*, 532 F.3d at 453)). Further, a plaintiff must prove that the defendant's failure to provide him or her with a "free appropriate public education: was "discriminatory." *Campbell v. Bd. Of Educ. of the Centerline Sch. Dist.*, 58 F. App'x 162, 167–68 (6th Cir. 2003) (granting defendant summary judgment on § 504 and ADA claims where plaintiff had not evidenced "that defendant had recklessly selected an inappropriate

accommodation."). Moreover, "either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of education of handicapped children." *Id.* (quoting *Monahan v. State of Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982). "To prove discrimination in the education context, something more than a mere failure to provide the free appropriate education required by the IDEA must be shown." *S.S.*, 532 F.3d at 453.

Plaintiffs bring claims for violation of § 504 and the ADA against Defendants under the same circumstances already asserted for utilization of the body sox with N.C. and because N.C. fell while wearing it. (Pls.' Opp. at 34.) As previously discussed, the facts asserted by Plaintiffs show that N.C. remained in the classroom while he wore the body sox and that he only wore the body sox for a short period of time. Furthermore, the facts establish that Ms. Plummer's choice to utilize the body sox with N.C. was based on advice from a fellow special education teacher as a therapeutic tool. Plaintiffs point to no evidence establishing that use of the body sox was done in bad faith or based on gross misjudgment. Accordingly, based on the subject record, Plaintiffs could not convince any rational fact-finder that Defendants had "discriminated" against N.C. through utilization of the body sox. Thus, the Court **GRANTS** judgment for Defendants on Plaintiffs' claims under § 504 of the Rehabilitation Act and the ADA.

**D. Remaining State Law Claims**

The Court's grant of summary judgment on the § 1983, § 504, and ADA claims leaves before the Court only Plaintiffs' state law claims for civil assault (Count 2), civil battery (Count 4), false imprisonment and unlawful restraint (Count 5), intentional infliction of emotional distress and negligent infliction of emotional distress (Count 6), negligence (Count 7), and negligent hiring, supervision, and retention (Count 8). Where, as here, a district court has dismissed all of the claims over which it had original jurisdiction, the court may decline to

exercise supplemental jurisdiction over the remaining claims. *See* 28 U.S.C. § 1367(c)(3). The decision whether to exercise supplemental jurisdiction over a claim is purely discretionary and depends on judicial economy, convenience, fairness, and comity. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). As a rule of thumb though, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc.*, 89 F.3d at 1254–55.

After analyzing the relevant considerations, the Court concludes that it will decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. The case has not proceeded to trial yet. Moreover, this case implicates questions of Ohio, not federal, law. These issues as well as the other state law issues are best resolved by an Ohio court.

Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, the parties' motion for summary judgment on those claims are **DENIED** as moot.

Furthermore, the Court finds that the expert testimony provided by the parties speaks to Plaintiffs' state law claims. Accordingly, at this time the Court declines to rule on the whether the proposed experts are sufficiently qualified to offer expert testimony in this matter. Accordingly, Plaintiffs' and Defendants' Motions in Limine are **DENIED** as moot. (ECF Nos. 90, 92.)

V.

For these reasons, Defendants' Motion for Summary Judgment (ECF No. 77) is **GRANTED IN PART** and **DENIED IN PART**, Defendants' motion to strike (ECF No. 94) is **DENIED** as moot, Plaintiffs' Motion to Strike (ECF No. 93) is **DENIED** as moot, Defendants'

Motion in Limine (ECF No. 90) is **DENIED** as moot, and Plaintiff's Motion in Limine (ECF No. 92) is **DENIED** as moot. Plaintiffs' remaining state law claims are **DISMISSED** without prejudice, and the Clerk is **DIRECTED** to enter judgment in this action.

        **IT IS SO ORDERED.**

10-4-2017
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT CHIEF JUDGE**